Your Honor, Justin Quinn, appearing for the appellant claimant, Mark Brewer. We're here today because back in November 28, 2011, the United States took from Mr. Brewer $63,530. And after some judicial proceedings, Judge Gossett determined that the United States was right in that respect, and we believe that Judge Gossett's ruling in that regard was incorrect in four respects. First off, the United States failed to give proper notice to Mr. Brewer of the non-judicial foreclosure, and there's some question about what the proper remedy is when that happens. We don't believe that the United States ever demonstrated by a preponderance of the evidence that there was a substantial connection to a crime. We believe that Mr. Brewer was an innocent owner of this money and that it would constitute an unjust fine under the Eighth Amendment. With regards to the, I'll start with the statutory claim we have under 18 U.S.C. 983, with regards to the failure to provide timely notice to Mr. Brewer. First off, and it's, and I have to be honest, the government actually provided a better chart of it than I did in my brief. The government attempted to send notice to Mr. Brewer on three separate occasions. The first occasion was on January 9th of 2012. At that time, four letters were sent out to Mr. Brewer. Two of them were actually not addressed to Mr. Brewer. They were addressed to a Mark Biener, and naturally those didn't make their way to Mark Brewer because they weren't addressed to the proper person. There were two letters sent, one to a prior address of Mr. Brewer's, which should under no circumstances have been considered to have gotten to him, which leaves us with the first letter that was sent from Quantico, Virginia on January 9th, and there was affidavit evidence at the hearing on the motion to dismiss that that was sent at 1300 hours, and that that letter came back, somehow circulated from Quantico, Virginia to Schaumburg, Illinois, and back to the desk of the agent in Quantico, Virginia at, I think it was 1123 hours on January 10th. That in and of itself should have clued in the agent to the fact that that letter was not sent properly and probably should have been re-sent immediately. That letter wasn't actually re-sent, again, for 50 full days on February 29th, 2012, which was 93 days after the actual seizure on November 28th, 2011. Which brings us to 18 U.S.C. 983, and I have to admit I have some discomfort with the way this statute all works together. It's not entirely clear what remedy is available to the claimant when he doesn't get proper notice. You know, if you go through it under 983A sub 1, sub F, it says if notice isn't sent, the money shall be returned. And I actually did the whole law school thing where you go through and you underline the shall and the may and the ors. It's not a permissive return. The money shall be returned. So if you accept that notice was not reasonably sent to Mark Brewer within the first 90 days, there's absolutely no question that that money had to be returned to Mr. Brewer. It doesn't mean that the government couldn't later file their motion or application for forfeiture, and they ultimately did file their application for forfeiture. And so from our perspective, there's absolutely no question that from about February 27th of 2012 through June 12th of 2012, Mark Brewer was absolutely entitled to the possession of $63,000, and the government was essentially holding that money illegally. And so what remedy is available to him? Well, I think we cited to a case out of the District of Puerto Rico where the district court judge there, and blessedly this issue doesn't come up particularly frequently, the district court judge there decided that the proper remedy was to actually dismiss the forfeiture action outright. I understand there's some other case law out there that does recognize that what should be done is it should just be ignored, essentially. The person didn't get noticed, but the actual forfeiture action was filed. It doesn't matter. It's in the hands of the government. I think it actually says it seems ridiculous to give the money back only to file the forfeiture and retake it from them. But to deprive somebody of their funds during that time period, the use of enjoyment, perhaps they could have used the money to hire an attorney during that time period, whatever the case, if the government ultimately wasn't able to gain possession of the funds back, they would just be able to obtain a judgment against them. I think the only way to give meaning to the word shall return the money in subsection F of 983 is to require the dismissal if the government doesn't ultimately return the money. With regards to the substantial connection to the crime charged in this, I do want to recognize... The forfeiture action, the statute under which it proceeded, required possession by the government at the time it filed the action? I don't believe so, sir. I think... So that seems to me then, if they can do a judicial forfeiture without possession, subject to the property in question having been destroyed or disappeared, why does that have to be dismissed? Well, it's the fact that if you look at 983 sub F, it says that the money shall be returned. And obviously in this particular case, it wasn't returned within that time period. We believe it should have been from February 26th through June 12th, 2012. That money should have been returned to Mr. Brewer and it wasn't returned to Mr. Brewer. And effectively, there is no remedy for a claimant for the fact that they... He could have had interest for four months. Well he could have. Mr. Brewer could have had... If you're talking about a remedy that is not unduly punitive to either side, why isn't that the obvious remedy? That is another remedy. I don't believe that's come up as a potential remedy. The only two remedies I'm aware of that... No. Sure. Interest rates are terrible. I think it would have been $20 or something like that for those four months. From what I'm aware of, the District Court of Puerto Rico has indicated a dismissal. I think the Ninth Circuit actually said that the intrusion was not warranted. The government could have taken possession of the money. And so, they've adopted the remedy that it doesn't matter that the statute says shall. Our proposed solution, I think, is what actually gives meaning to all of the words within the statute. With regards to the substantial connection to this crime, Mr. Brewer stopped on November 28th for changing three lanes. The officer took him back to the car and spoke to him for a bit, ultimately decided not to issue him a citation, and told him he could go. It was actually commented on by Judge Gossett in the middle of the trial. I think the exact words, remarkably, Mr. Brewer could have left at this time, and he continued to talk to the officer, continued to speak to him, gave him permission to search the car. He wasn't acting like a person who was engaged in illegal activity. There wasn't an odor of marijuana around the car when he stopped. It was only when this officer went to the... Was the dog alerted to the driver's side? I'm not... No, sure. I'm saying that the officer initially smelled, but the dog didn't just alert to the cash. No, once the officer did do a walk around the vehicle with the dog, the dog did alert to the driver's side of the car. The officer could only smell it in the bag when he opened the bag. When the officer opened the bag, he smelled marijuana, which... They always smell a strong odor of marijuana. I don't know why they don't just spell marijuana. I don't... I've never actually read them say, I just smell marijuana. It's always the strong odor. There's no actual connection of marijuana here. The only connection to marijuana is actually Mr. Brewer on the stand admitted that he had smoked marijuana the day beforehand. And quite frankly, I don't see where the government's ever alleged a reasonable story of where there was a law violation. They've essentially said that there's cash here, and the dog alerted to drugs, and then the officer's testimony that they smelled marijuana. There's no... I mean, I can't come up with a story that makes sense. There's no question Mr. Brewer... You've got to deal with the actor's credibility finding though. I mean, that's very difficult on the field. That's probably the most difficult thing. Judge Gossett just didn't find Mr. Brewer credible. But the facts that were uncontested I think are sufficient to overcome that. Mr. Brewer started off in Schaumburg, Illinois. There's no question that he lived there. And I don't think that there's any question that he was traveling from Schaumburg to California, and he was carrying this cash with him. There's not even been speculation of what the story would have been that would have allowed for this to be a substantial transaction. Was he conducting a... I don't see the story that makes sense. Is he going to California to purchase the marijuana? Or where does this odor of marijuana come from? It seems mostly... I mean, I have pure speculation. Sure. Someone not close to the case, but when I read the facts, it occurred to me that one plausible explanation is the $1,000 in his shirt pocket was his fee as a mule. That hadn't occurred to me, actually. When I added it all up, if you look at the amounts totaled from his bank statements, I mean, this guy opened up his bank records for a period of four years and said, hey, look at this. I mean, there's no evidence of him regularly traveling across the country. There's no evidence of him that would have indicated he was in the drug trade. If you added up all of his withdrawals, they added up to about $64,500. And if you take the amount seized, I mean, it added up to about $66,000. So if you take the amount seized with $1,000, they actually add up pretty much within $200 to what had actually been withdrawn from his bank accounts over the course of those four years. In fact, if I were to cite a case that this was closest to, and I'm sorry it wasn't in my brief because it wasn't decided until about 20 days after it was submitted, would be the United States v. $48,100. There was some evidence, literature regarding it. There was a minor lie to the officer. In this particular case, Mr. Brewer has post-traumatic stress disorder that led to his hoarding of the cash. Of course he distrusts the government. That's why he doesn't necessarily tell the officer about the money. And the one thing you can't say is that that's a completely unreasonable position of his. I mean, as soon as the government found out about this money that he was hoarding, they took it from him. And so his distrust of the government was at least partially based in reality. The government did attempt to distinguish this in their brief by saying that the only two distinctions they drew was the dog sniff. That seems like a distinction without a difference. In $48,100, there was actual marijuana in the car. Certainly a drug dog would have indicated on that actual marijuana versus this smell of marijuana that was lingering like the smell of a pizza, as the officer put it. And then- That's where I thought the alert on the driver's side was, I don't know how significant, but an additional- I mean, it was more than just, as we judge being criticized in Mohammed, it was more than just alerting to the cash. Well, I mean, in $48,100, there were two separate areas of marijuana. The gentleman had two grams up by his driver's seat, and then he had a glass jar where he had, I think it was 17.5 grams of marijuana. So, I mean, there were two spaces in that car, well, in that RV. And so there's not-I don't see the difference between this case and the United States versus $48,100. In fact, in our case, we actually presented, once again, his full bank records indicating where the money came from, showing that he didn't have a history of traveling across the country, which would perhaps indicate that he was a drug mule. Additionally, there was some evidence presented of his post-traumatic stress disorder, which would justify his hoarding of cash. When you go through these cases and you read all of them, everybody who's found these monies, they all say, well, why do you keep this money? I don't trust the government. I don't trust banks. Some of them are truthful. Some of them aren't. But ultimately, the only reason to keep this kind of money and cash is because you don't trust the government, because you don't trust banks. I'll touch briefly just on the innocent owner and the Eighth Amendment violation. With regards to the innocent owner, once again, Mr. Brewer has shown where all this money came from. He demonstrated that. I think the facts that would justify innocent owner are very similar to the ones that I've argued with regards to the substantial interest. Finally, with regards to the Eighth Amendment violation, the Eighth Amendment does require some proportionality between the illegal activity and what the fine is. It was recognized that the forfeitures can be considered a fine that would justify an Eighth Amendment analysis. In this particular case, there's absolutely no crime to compare this to. We don't know how much marijuana we're talking about. We don't know if he's a drug mule. We don't have any connection to any alleged crime at all. So to deprive him of in excess of $63,000 without anything to tie it to. Mr. Brewer, I guess, admitted to smoking marijuana the night before. I think in Nebraska that carries a $300 fine. So maybe that's a proportional remedy. But unless there's questions, I'll reserve what little time I have left. Thanks. Ms. Sloboda. Police Court, good morning, Your Honors. I'll pick up with, if it's all right with you, I'll pick up with where Mr. Quinn left off on the excessiveness challenge. As Judge Gossett set out, and as this court has set out, that is the claimant's burden to come forward on. And Mr. Brewer put on no evidence regarding a disproportionality or an excessive fine claim. He just stated the obvious. There's no crime out there. It's sort of, it's facially disproportionate. If you take the Eighth Amendment as applying full bore to this kind of a forfeiture. But that's not the only thing that the trial court could look to to make an excessive fines analysis. And there's simply no other evidence that the claimant put on which would rebut an excessive fines challenge. All he did was say, this is my money, and I wasn't charged with a crime. That's not an excessive fines challenge, at least according to Judge Gossett. And if you look at the record, the words excessive fines or disproportionality were never even mentioned during the trial. So to say that the judge, I take that back. They were in the pretrial conference order. But it wasn't talked about during the trial. So there was an issue about it in the pretrial conference order. It's setting forth what the issues would be at trial. And then, like I said, Mr. Brewer didn't put on any of that evidence. So Judge Gossett, I submit, was completely correct in that because the claimant didn't put any of that evidence on, then there was no excessive, it wasn't an excessive fine. As far as the innocent owner, I understand, as Mr. Brewer said repeatedly- I'd stay with that. I haven't researched this Eighth Amendment issue. Does the government concede that administrative forfeiture of contraband, ownership of which is claimed by an innocent third party, is subject to Eighth Amendment excessive fine analysis? And your contraband in your hypothesis, Judge, is the money. Drug proceeds. And the government proves they were forfeitable drug proceeds, and an innocent third party proves that he or she would otherwise be the owner. Sure, Judge. Did the Eighth Amendment apply to that? Sure, Judge. Sure. What's the analysis? Well, the analysis- That we're punishing the innocent third party? Well, the analysis that this court has given us is what's set out in Dodge Caravan. And there's a lot of elements there. Almost all of them have to do with the criminal side of it. How much dope was involved? How long was it going on? What was the value of the drugs? That was talked about in Dodge Caravan. But, Judge, Mr. Brewer- That proceeds and the claimant is a bona fide purchaser. I mean- Then Mr. Brewer should have brought that out during the trial. Justice Thomas has the right approach to the Eighth Amendment. This is sort of- Okay, I'll have to look at Dodge Caravan. I don't know how you could ever do a proportionality analysis between forfeitable contraband and an innocent third party, an innocent owner. Then Mr. Brewer should have brought that out at trial. That's our position. And that's the position that Judge Gossett took, I believe, or certainly paraphrased. And that if it was Mr. Brewer's burden to show that it was disproportionate, he failed in that burden. I will move to the innocent owner provision. And I'm going to repeat, Judge Loken, what you mentioned before is without- Pardon me, I don't mean to sound flippant. But the bottom line is Judge Gossett, the trier of fact, did not believe Mr. Brewer. To say that Mr. Brewer essentially said, I've been in the military, everything was paid for, and when I got out of the military I lived with my parents or I lived with friends and I didn't pay any bills. And I saved up every- I believe the testimony was 75 to 90% of my paycheck when I was in the military. And here's my list of what I've received from 2007 to 2012. And then lo and behold, holy cow, that adds up to right at about $63,530. Judge Gossett found that not credible, self-serving, and uncorroborated. And he's the trier of fact. He was watching Mr. Brewer in the courtroom. He heard the cadence of his voice. He saw it all and he chose not to believe it. And there were other things that Mr. Brewer said that would be considered lack credibility because they were either uncorroborated or self-serving. The first time the deputy went to ask Mr. Brewer if there's any money in the car, he says, nope, no money in the car. Then after the money's found, well, yeah, there is money in the car. And then he tells the story about going to buy the house at the discounted rate from his uncle, from a guy who Mr. Brewer can't name. Mr. Brewer says, I'm not employed, I'm in school full time, and I found out about this house deal. So I took all my $1,000 bundles of money, took them out of my safe, threw them into three separate grocery sacks, threw them into a backpack that smelled like marijuana, took off to California because I'm a young man and I've got an investment opportunity, even though this same young man has little or no knowledge of real estate, and he's going to take this opportunity to invest at his uncle's behest or with his uncle's advice, and he doesn't even know the name of the man from whom he's going to buy it. And while he's taking that journey, he's so poor that he has no money, so he's going to sleep alongside the road in rest stops or maybe in his car. He tells the deputy he thinks he has $800 in his pocket when actually he's only got, he actually has $1,000 in his pocket, has very little money in his wallet. I submit that when you're that poor, you know exactly how much money you have in your pocket and how much is in your wallet. Mr. Brewer says during the trial that the reason he lied to the deputy, Deputy Wintle, about having a large sum of money in the vehicle is because he was afraid Deputy Wintle would steal from him. Mr. Brewer said that he didn't know Deputy Wintle, had never been around Deputy Wintle before, had no reason to really believe that other than the fact that I'm from Chicago and Chicago cops are bad. This from a man who was a military police officer in the military. I submit that Judge Gossett had before him such, as he called, lacking incredible statements, that his decision that Mr. Brewer was not an innocent owner was not clearly erroneous. Your Honors, the issue of whether proper notice was sent by the DEA, also referred to in the brief says Mr. Brewer's motion to dismiss. The money was seized by Douglas County Sheriff's Office on November 28, 2011, turned over to the DEA or the DEA adopted it for federal forfeiture on December 27, 2011. DEA sent its first notices out as shown in the grid in the brief on January 9, 2012. Those notices said the claim date, the date by which Mr. Brewer's claim had to be received by DEA would be February 13, 2012. All those notices came back, weren't served on anybody. Then DEA publishes. Then DEA sent notice to the same addresses again on February 29, 2012. Those notices said, Mr. Brewer, your claim date is April 4, 2012, and DEA did receive Mr. Brewer's claim on March 21, 2012. Then just to come full circle, the United States forfeiture complaint, the case we're here on now, was filed June 12, 2012, 83 days after the claim was received by the DEA. Your Honors, I can't speak to why DEA sent notices on January 9 and then also sent notices on February 29. Those are the facts. There's no facts in the record about why there's such a time lag between. But I submit to you, forgive me, I didn't mean to turn my back on you. I submit to you that the addresses that the DEA sent the notices to, addressed to Mr. Brewer, were those as I set forth in page 11 of my brief. The addresses the DEA had were off the paperwork that Mr. Brewer had in his own car or on his own person, like his driver's license. His driver's license was the one in Palatine, Illinois. Car insurance paperwork was the one on Cambria Drive in Schaumburg, which is ultimately where he received it. And then it does sound strange that this other person named Mark Beiner, B-I-E-N-E-R, would be noticed at Mr. Brewer's address, but that's how the vehicle registration paperwork was. So those are the actions of the DEA. But, judges, the statute at issue, 983, little a, then 1, then capital A, then Roman numeral little, little Roman numeral 4, says, Money seized by the local law enforcement officer turned over to a federal law enforcement agency for federal forfeiture. Notice shall be sent not more than 90 days after the date of seizure by that local law enforcement agency. DEA did that. Seizure by Douglas County Sheriff on November 28, 2011. Notices went out on January 9, 2012, 41 days. Then DEA published. Then DEA didn't pick up anybody, so DEA chose again. And I submit DEA went above and beyond what it was required to do by sending out a whole other round of notices and giving Mr. Brewer another chance to come forward. In the Nunley decision, this court said, Notice has to be reasonably calculated to apprise interested parties of the action and afford those parties the opportunity to present objections. I submit that once all those notices came back from DEA on the January 9 notices, and then the publication was made, I submit DEA could have gone forward with its administrative forfeiture because it gave the notice as it was required to the addresses that were associated with Mr. Brewer coming out of his own vehicle, and they published. But instead DEA chose to do it one more time, and that's when Mr. Brewer came forward and threw his claim through his attorneys, Mr. Quinn, and then this case developed. So the statute and the case law says if you give out the notice within the timeline, DEA did that. The United States filed its complaint within the time the statute and the case law said to do so. The finding that Judge Gossett made denying the motion to suppress or finding proper notice had been given by DEA was not clearly erroneous. Your Honors, the final issue is the substantial connection to drug trafficking. I have said to this court time and time again that this court has said its words are bundling and concealment of large amounts of currency combined with other suspicious circumstances supports a connection between the money and drug trafficking. We got a large amount of currency in this case. In the $48,100 case that you issued this summer, this court called $48,100 a large sum, so the money at issue here today is more than that. Bundled, 64 bundles, each folded in half, held by a rubber band, $1,000 bundle, easily transferable just like both Mr. Brewer and Deputy Wintle said. Concealed, wrapped in three plastic grocery sacks inside of a backpack that smelled of marijuana. What are the other suspicious circumstances? Again, Mr. Brewer lied to the deputy. That's been important to this court in the past for whatever the reason, whether it's because he's afraid of police officers or whether it's because, oh, my God, now it's been found. But the bottom line is a law enforcement officer asked Mr. Brewer if there's any money in the vehicle over $10,000, and Mr. Brewer lied. Well, he lied in $48,100. Yes, yes, and he's lied in $124,000. I mean, it does make a difference what the lie is and what the explanation is. Okay, Judge, okay. Brewer's travel itinerary, which I've gone over before, about he's in school, he has no job, so he decides to just take off right away to California with all this money that he has the presence of mind to wrap into three plastic grocery sacks and throw in the backpack and take off. The words that you used in $48,100 were that burden, bundling, concealment, large amounts of currency, and applying common experience considerations. What, if I just may finish, Your Honors, what Mr. Brewer told Judge Gossett about the source of the money and why he was going out to California. You've covered that. Okay, okay. Your Honors, I'm out of my time. I ask you to affirm the decisions of the district court. Thank you. Mr. Quinn, do you have some time? I'll speak quickly. I want to address just pretty much just one issue there. She keeps talking about concealment, and I want to compare the concealment in this case to the concealment in other cases. I mean, in the $48,100 case, it was at least in a plastic Ziploc baggie. In sort of the two other main cases regarding forfeiture before the circuit, United States versus $124,700, and United States versus $86,000, some odd, $84,615. In the first case, the money was wrapped in aluminum foil in a plastic bag in a cooler in the backseat. The amount of concealment there was significantly greater than some grocery bags. And then in the $84,615, it was actually in vacuum-sealed bags. I think there's a fundamental difference there between that and grocery sacks. And I'm out of time. Thanks. Thank you, Counsel. The case has been very well briefed and argued, and the argument has been helpful. We'll take it under review. Thank you, Your Honors.